# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

UNITED STATES ex rel                     :          Civil Action No.
                                         :
**UNDER SEAL,**                          :
                                         :
                                         :          Date Received: _____
                                         :
BRINGING THIS ACTION ON BEHALF :
OF THE UNITED STATES                     :          Complaint **Filed**
OF AMERICA                               :          **IN CAMERA**
                                         :          **SEALED**, Pursuant to 31 U.S.C.
David Rivera                             :          § 3730(b)
U.S. Attorney                            :
Middle District of Tennessee             :
110 Ninth Avenue South                   :
Suite A-961                              :
Nashville, TN 37203                      :
                                         :
and                                      :          _____
                                         :
                                         :          United States District Court
Loretta Lynch                            :          Judge
Attorney General of the United States    :
Department of Justice                    :
10th & Constitution Aves. N.E.           :
Washington, D.C. 20530                   :
                                         :
             Plaintiff and Relator,      :          **FALSE CLAIMS ACT COMPLAINT**
                                         :          **AND JURY DEMAND**
vs.                                      :
                                         :
**UNDER SEAL**                           :          **DO NOT PLACE IN PRESS BOX**
                                         :          **DO NOT ENTER ON PACER**
             Defendant.                  :


## FALSE CLAIMS ACT COMPLAINT

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES ex rel | : | Civil Action No. |
| | : | |
| SUZANNE ALT | : | |
| | : | |
| | : | Date Received: _____ |
| BRINGING THIS ACTION ON BEHALF | : | |
| OF THE UNITED STATES | : | Complaint **Filed** |
| OF AMERICA | : | **IN CAMERA** |
| | : | **SEALED**, Pursuant to 31 U.S.C. |
| David Rivera | : | § 3730(b) |
| U.S. Attorney | : | |
| Middle District of Tennessee | : | |
| 110 Ninth Avenue South | : | |
| Suite A-961 | : | |
| Nashville, TN 37203 | : | |
| | : | |
| and | : | |
| | : | _____ |
| Loretta Lynch | : | United States District Court |
| Attorney General of the United States | : | Judge |
| Department of Justice | : | |
| 10th & Constitution Aves. N.E. | : | |
| Washington, D.C. 20530 | : | |
| | : | |
| Plaintiff and Relator, | : | **FALSE CLAIMS ACT COMPLAINT** |
| | : | **AND JURY DEMAND** |
| vs. | : | |
| | : | |
| ANESTHESIA SERVICES | : | |
| ASSOCIATES, PLLC | : | |
| d/b/a COMPREHENSIVE PAIN | : | |
| SPECIALISTS | : | |
| | : | |
| Defendant. | : | |

## <u>COMPLAINT</u>

COMES NOW Relator, Suzanne Alt, on behalf of herself and the United States of

America and alleges as follows:

1

## INTRODUCTION

1.      Relator brings this action on behalf of herself and the United States of America to recover statutory damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-33.

2.      These claims are based upon Defendant's submission of false and fraudulent patient claims for payment to the United States, and its fiscal intermediaries, in order to obtain millions of dollars in payments from Medicare from 2010 to the present. Defendant's false and fraudulent claims to the United States took various forms including the use of full panel drug screens and physician compensation arrangements in violation of the Stark Law.

3.      Relator has complied with the requirement of the False Claims Act to provide all of her material evidence to the United States prior to filing suit.

4.      Relator is serving the U.S. Attorney for the Middle District of Tennessee and the United States Attorney General with a copy of this Complaint filed under seal.

## JURISDICTION AND VENUE

5.      This action arises under the False Claims Act, as amended, 31 U.S.C. §§3729-33.  This Court has jurisdiction over this action under 31 U.S.C. §3730 and 28 U.S.C. §§ 1345 and 1367 (a).

6.      The Court has personal jurisdiction over the Defendant, because they are a Tennessee Professional Limited Liability Company and can be found in, are authorized to transact business in, and are transacting business in the Middle District of Tennessee, and because the Defendants committed acts within this district and division that violated 31 U.S.C. §3729.

2

7.     Realtor, Suzanne Alt, is a citizen of Missouri and the United States of America. Dr. Alt is a former employee of Comprehensive Pain Specialists and worked as a physician in a Comprehensive Pain Specialists office in Troy, Missouri from May 2014 until January 2015 and in Keokuk, Iowa from January 2015 to March 2015. During her time at Comprehensive Pain, Dr. Alt was personally told to increase the frequency of the drug screens at issue in this Complaint during weekly conference calls with her regional director, Angela Baker. Dr. Alt was instructed by her direct supervisor, Dr. Kyle Longo, to only perform full panel testing on patients at Comprehensive Pain. Prior to employment with Comprehensive Pain, Dr. Alt visited the Nashville laboratory owned by the Defendant. There, she saw the large volume of urine specimens being tested from all locations, firsthand. Relator gained her direct and independent knowledge of Defendant's fraudulent conduct by personally dealing with the Defendant and investigating their conduct.

8.     Defendant Anesthesia Service Associates, PPLC d/b/a Comprehensive Pain Specialists (hereinafter, "CPS") is a large multi-state system of pain management clinics with a very large central laboratory in Tennessee. Founded in 2005, CPS has grown rapidly to 60 locations in 11 states, including its central laboratory in the Nashville, Tennessee area.   CPS has pain clinics in Alabama, Arkansas, Illinois, Indiana, Kentucky, Missouri, Mississippi, North Carolina, Ohio, South Carolina, Tennessee, and previously Iowa.

**THE LAW**

3

9.      Except as specifically noted in the Complaint, the allegations herein apply to the

time period of 2010 through the present.

**The False Claims Act**

10.     The False Claims Act provides in pertinent part that:

> (a) any person who - - (A) knowingly presents,  or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or  decreases an obligation to pay or transmit  money or property to the Government,

> \* \* \* \*

> is liable to the United States Government for a civil penalty of not less than $5,500.00 and not more than $11,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 Note; Public Law 104-410), plus three times the amount of damages which the Government sustains because of the act of that person.  (b) For purposes of this section(1) the terms "knowing" and "knowingly" (A) means that a person, with respect to information (i) has actual knowledge of the information; (ii) acts and deliberate ignorance of the truth or falsity of the information, or (iii) acts in reckless disregard of the truth or falsity of the information; and, (B) require no proof of specific intent to defraud; (2) the term "claim" (A) means any request or demand, whether under contract  or otherwise, for money or property and whether or not the United States

4

has title to the money or property that (i) is presented to an officer, employee or agent of the United States, or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested and demanded and (3) the term "obligation" means an established duty, whether or not fixed, arising from an expressed or implied contractual, grantee-grantor, or license-licensee relationship, from a fee-based or similar relationship, from a statute or regulation, or from the retention of any over-payment; and (4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. 31 U.S.C. §3729

**The Stark Law**

11.  Enacted as amendments to the Social Security Act, 42 U.S.C. § 1395nn (commonly known as the "Stark Law") prohibits a hospital (or other entity providing designated healthcare items or services) from submitting Medicare claims for payment based on patient referrals from physicians having a "financial relationship" (as defined in the statute) with the service provider.   The regulations implementing 42 U.S.C. § 1395nn expressly require that any entity collecting payment for a designated healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis."  42 C.F.R. § 411.353.

5

12.   The Stark Law establishes a clear rule that the government will not pay for designated healthcare items or services prescribed by physicians who have improper financial relationships with other providers.  42 U.S.C. § 1395nn(g)(1).  In enacting the statute, Congress found that improper financial relationships between physicians and entities to whom they refer patients can compromise the physicians' judgment as to whether an item is medically necessary, safe, effective, and of good quality.  Congress relied upon various academic studies consistently showing that physicians who had financial relationships with hospitals and other entities used more of those entities' services than similarly situated physicians who did not have such relationships.  The statute was designed specifically to reduce the loss suffered by the Medicare and other Federal Healthcare programs due to such increased questionable utilization of services.

13.   Congress enacted the Stark Law in two parts, commonly known as Stark I and Stark II.  Enacted in 1989, Stark I applies to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992 by physicians with a prohibited financial relationship with the clinical lab provider.  *See* Omnibus Budget Reconciliation Act of 1989, P.L. 101-239 § 6204.

14.   In 1993, Congress extended the Stark Law ("Stark II") to referrals for ten additional designated health services.  *See* Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152.

15.   As of January 1, 1995, Stark II applied to patient referrals by physicians having a prohibited financial relationship for the following ten additional designated health services: (1) Inpatient and outpatient hospital services; (2) Physical therapy; (3) Occupational therapy; (4) Radiology; (5) Radiation therapy; (6) Durable medical

6

equipment and supplies; (7) Parenteral and enteral nutrients, equipment and supplies; (8) Prosthetics, orthotics and prosthetic devices and supplies; (9) Outpatient prescription drugs; and (10) Home health services. *See* 42 U.S.C. § 1395nn(h)(6).

16. In pertinent part, the Stark Law provides:

1. Prohibition of certain referrals

1. In general

Except as provided in subsection (b) of this section, if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then –

(A) <u>The physician may not make the referral to the entity</u> for the furnishing of designated health services for which payment otherwise may be made under this chapter, and

(B) <u>The entity may not present or cause to be presented a claim under this subchapter or bill</u> to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).42 U.S.C. § 1395nn (emphasis added).

17. The Stark Law broadly defines prohibited financial relationship to include any "compensation" paid <u>directly</u> or <u>indirectly</u> to a referring physician. Violation of the statute may subject the physician and the billing entity to exclusion from participation in federal health care programs and various financial penalties, including (a) civil money penalty for each service included in a claim for which the entity knew or should have known that the payment should not have been made under Section 1395nn(g)(1); and

7

(b) an assessment of the amount claimed for a service rendered pursuant to a referral the entity knew or should have known was prohibited.

18.    In sum, the Stark Law prohibits healthcare providers from billing Medicare and other federal health care programs for certain designated services referred by physicians with whom the provider has a financial relationship not falling within the safe harbors.  The statute specifically prohibits providers from billing for such services.  The Stark Law was applicable to the entire time period of this complaint.

**The Anti-Kickback Statute**

19. The Federal Anti-Kickback statute, contained at 42 U.S.C. §1320a-7b(b), prohibits the offer, solicitation, payment or receipt of anything of value which is intended to induce the referral of patients for items or services reimbursable in whole or in part under any federal health care program, or to induce the ordering, recommending or arranging of items or services reimbursable in whole or in part under any federal health care program.  The Anti-Kickback Statute was enacted in 1972.

## THE MEDICARE PROGRAM

20. Title XVIII of the Social Security Act, 42 U.S.C. § 1395*, et seq.*, establishes the Health Insurance for the Aged and Disabled Program, popularly known as the Medicare program. The Secretary of HHS administers the Medicare Program through CMS, a component of HHS.

21. The Medicare program consists of multiple parts.  Medicare Part A provides basic insurance for the costs of hospitalization and post hospitalization care.  42 U.S.C. §1395c-1395i-2 (1992).

22. Medicare Part B is a federally subsidized, voluntary insurance program that covers

8

a percentage (typically eighty percent) of the fee schedule amount for physician, laboratory and diagnostic services. 42 U. S.C. §§ 1395k, 13951, 1395x(s). Reimbursement for Medicare claims is made by the United States through CMS. CMS, in turn, contracts with private insurance carriers, known as fiscal intermediaries, to administer and pay Medicare Part B claims from the Medicare Trust Fund. 42 U.S.C. § 1395u.

23. As a condition of payment, the Defendant was required to expressly or impliedly certify compliance with the Medicare laws and regulations including the Stark and Anti-Kickback laws.

24. At all times relevant to the Complaint, Defendant was a Participating Medicare Part B provider. The Defendant submitted claims to Medicare for services that were tainted and false by the nature of the prohibited financial relationship between Defendant and its physicians as described below.

25. At all times relevant to the complaint, the Medicare program constituted a substantial source of revenue for the Defendant.

### THE FRAUDULENT SCHEMES AND FALSE CLAIMS FOR PAYMENT

Full Panel Drug Screen Testing on All Patients

26. Full Panel Drug Screens are used to test for a full confirmation of any and all drugs. When performing a full panel drug screen, a patient provides a urine sample in the CPS physician's office. That sample is then sent to CPS central lab in the Middle District of Tennessee where a full panel drug screen is performed using a gas chromatograph. CPS then bills Medicare for the full panel drug screen performed by its central lab.

9

27.     An alternative, and far less costly drug test, is Point of Care testing ("POC"), which can be done in office and is used once the patient has developed a history with the physician and the office. To perform a POC test, the patient provides a urine sample in the physician's office.  The sample can be provided in a rapid screen cup, such as the Nobel Rapid Screen cup, that provides test results on the cup itself.  The sample can also be provided in a plain cup and a test dipstick used to provide the rapid screen result in the office.   POC testing can target specific drugs, so that unnecessary tests are not being performed and billed to the Government once the patient has shown a history of compliance and is no longer an at-risk patient.

28.     CPS Providers are strongly encouraged to order full panel urine drug screens on each patient, every time, despite the patient's history, compliance, and risk. This was verbally encouraged to the Relator in weekly conference calls with Angela Baker, Dr. Alt's regional director. In those calls, Ms. Baker would encourage an increase in the frequency of the Full Panel Testing on patients, regardless of clinical need. Dr. Kyle Longo, Dr. Alt's regional supervisor, also told her that CPS does not do point of care testing.  CPS only tests full panel and that she was to test the CPS way.  On information and belief, Dr. Alt states that there are no risk stratification guidelines used by CPS to determine protocols for high, moderate, and low risk patients. None were provided to her by CPS.  Rather, all patients are tested with full panels. Dr. Alt confirm the CPS practice of testing all patients with full panel drug screens with two other CPS physicians: Dr. E.J. Oddono in North Carolina and Dr. Suresh Krishnan in Missouri. Because of the weekly conference calls, where full panel testing was pushed, included other CPS doctors; because Dr. Alt has confirmed the practice with two other CPS

10

doctors in other locations; and, because Dr. Kyle Longo told her it was the CPS way to test all patients full panel, she has a strong factual basis to allege the practice of only ordering full panel drug screens was company wide at CPS.

29. Point of Care testing was not an option in CPS offices. There was no process for ordering and obtaining the materials needed for this type of test. CPS provided the testing cups and materials to its office locations, but did not include the cups and materials needed for anything other than full panel screens. CPS did not provide POC testing supplies to its physicians. In Dr. Alt's office, CPS provided her with a multitude of plain urine collection cups to send in the laboratory, but no Point of Care cups to perform targeted testing in her office. Additionally, the Electronic Medical Record ("EMR") system in place at CPS made it extremely difficult to order anything less than the full panel. Upon conversation with Dr. E.J. Odonno, this practice was confirmed as the same that was in practice in his North Carolina office.

30. CPS owns a laboratory in the Middle District of Tennessee. The CPS laboratory director is Dr. Peter Kroll. When Dr. Alt's office location in Iowa was set up, CPS provided her with a large number of pre-addressed UPS shipping labels to the CPS laboratory in Tennessee. Dr. Alt was instructed by Dr. Longo, her supervisor, to send in all urine specimens to the CPS laboratory in Tennessee. In fact, the EMR system used by CPS physicians was set up to automatically send the drug screen order for the full panel directly to the CPS lab. Each urine specimen from one of the 60 CPS locations is sent in to the CPS lab resulting in large volume testing being performed in and billed by the CPS laboratory. On information and belief, Dr. Alt states that an estimated average of 20 specimens per CPS practitioner were being sent in to the CPS laboratory for full

panel testing daily. Upon conversation with Dr. Odonno and based on his personal visit to the Tennessee laboratory, CPS management told him that they were billing at or around 600 full panel drug screens each day. Before going to work for CPS, Dr. Alt visited the central laboratory and saw walls and walls of urine cups stacked up for testing and for shipping empty cups to CPS doctors. During this trip, she learned that all CPS urine drug testing was done at the central laboratory.

31. Dr. Alt pointed out the problems with testing at CPS and questioned Dr. Kyle Longo about the repetitive ordering of full panel drug screens on established patients. Dr. Longo responded that CPS wanted Medicare patients to be screened for the full panel and disregarded her inquiry. Dr. Alt asked Dr. Longo specifically about Point of Care testing in mid-February of 2015. Dr. Longo's response was that CPS doesn't believe in that and that they only perform full panel testing at CPS. Dr. Longo instructed Dr. Alt to test the CPS way. About one month later, Dr. Alt was terminated.

32. CPS' system wide practice of billing full panel urine drug screens on all patients on every visit, results in medically unnecessary tests and an overutilization of services. Medicare is billed by CPS and pays for these unnecessary full panel urine drug screens. The claims for payment for these medically unnecessary full panel urine drug screens are false claims for payment. The claims are submitted on form CMS 1500 and contain the false certification by CPS that the services provided are medically necessary and provided in compliance with the Stark and Anti-kickback laws.

33. The central management of CPS office locations and the billing for testing was maintained in the CPS location within the Middle District of Tennessee. All management and billing information is in exclusive control of the Defendant. CPS removed the

12

physicians and their staff from day-to-day management tasks, such as scheduling patient visits, billing insurance companies, and taking patient complaints. When Dr. Alt ordered a drug screen, the order was automatically sent to Tennessee and her office did not have access to the order, except limited access to view the test results.

## Incentivizing Physicians to Overutilize Full Panel UDS by Paying Physicians A Percentage of Lab Revenue

34.    The Defendant's Employment Agreement, signed by the physicians, discusses compensation in Section 2 and refers to Exhibit A for compensation detail. (This document is attached to the Complaint as Exhibit 1). Exhibit A to the Employment Agreement, Section 3 sets out the compensation arrangement. This arrangement changes based on the physician's length of employment with CPS and the revenue collected.

35.    The contract on its face violates the Stark Statute, despite acknowledging the law. The Ancillary Services arrangement is set up so that the physician receives a share of collections for their laboratory revenue. The Defendant has specifically stated their knowledge of the law; therefore, their conduct is knowing within the meaning of the False Claims Act.

36.    For calculation, the shares of revenue are determined by the year of employment. In the first year, 50% of the physician's Ancillary Service Revenues are contributed to a pool for distribution to a "Non-Member Pool" of physicians of the Defendant. The second and third year, the revenues of the nurse practitioners and physician assistants working under the physician are added to the pool at 10%, while the physician continues to contribute 50%. The remainder of the Ancillary Services Revenues are retained by the Defendant.

13

37.     By incentivizing its physicians with a percentage of laboratory revenues, CPS is able to maintain its scheme to perform and bill for medically unnecessary urine drug screens on every patient at every visit.

## COUNT I
## VIOLATION OF 3729 (a)(1)(A)

38.     Relator hereby incorporates and re-alleges all the preceding paragraphs as if set forth fully herein.

39.     Defendant by and through its agents, officers, and employees, knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. §3729(a)(1)(A).

40.     The United States has been damaged as a result of Defendant's violations of the False Claims Act in an amount to be proven at trial.  The United States is entitled to this sum as reimbursement for monies obtained by the Defendant for false claims submitted to the United States.

41.     The United States is entitled to three times the total damages sustained as a result of the Defendant's violations.

42.     The United States is entitled to a civil penalty of not less than $5,500.00 and not more than $11,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 Note; Public Law 104-410) for each of Defendant's false claims.

43.     Relator is entitled to reasonable attorney's fees and cost pursuant to 31 U.S.C. §3730(d)(1).

## COUNT II
## FALSE CLAIMS ACTS VIOLATIONS 3729(a)(1)(B)

14

44.     Relator hereby incorporates and hereby re-alleges all of the preceding paragraphs as if fully set forth herein.

45.     Defendant by and through its agents, officers, and employees, knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim in violation of 31 U.S.C. §3729 (a)(1)(B).

46.     The United States has been damaged as a result of Defendant's violations of the False Claims Act in an amount to be proven at trial.  The United States is entitled to this sum as reimbursement for monies obtained by the Defendant for false claims submitted to the United States.

47.     The United States is entitled to three times the total of damages sustained as a result of the Defendant's violations of 31 U.S.C. §3729(a)(1)(B).

48.     The United States is entitled to a civil penalty of not less than $5,500.00 and not more than $11,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 Note; Public Law 104-410) for each of Defendant's false claims.

49.     The Relator is entitled to reasonable attorney's fees and cost pursuant to 31 U.S.C. §3730(d)(1).

## COUNT III
## FALSE BILLINGS INCIDENT TO ANTI-BACK/STARK ACT VIOLATIONS

50.     Relator hereby incorporates and re-alleges all preceding paragraphs as if set forth fully herein.

51.     From 2014 to the present, Defendant violated the Anti-Kickback/Self-Referral Laws, 42 U.S.C. §1395nn (a)(1), (h)(6) and 42 U.S.C. §1320a-7b(b), by entering into

15

prohibited financial relationships with physicians in order to obtain referrals of their patients.

52.     Defendant's violations of these laws rendered it statutory ineligible to receive payment for services rendered to patients referred pursuant to these prohibited relationships, under both the express terms of 42 U.S.C. §1395nn and by operation of the Medicaid/Medicare laws and regulations, including 42 C.F.R. §424.5 (a).

53.     The United States conditions payment on Defendant's compliance with the Anti-Kickback/Self Referral laws, 42 U.S.C. §§1395nn (a)(1), (h)(6) and 1320a-7b (b).

54.     Defendant submitted and continues to submit claims for payment rendered to Medicare and Medicaid patients while knowingly violating the Anti-Kickback/Self Referral laws and thereby statutorily ineligible to receive payment in violation of the False Claims Act, 31 U.S.C. §3729.

55.     Defendant's actions also caused the submission of claims for payment for services rendered for Medicare patients while Defendant was knowingly violating the Anti-Kickback/Self Referral laws and statutorily ineligible to receive payment violating the False Claims Act 31 U.S.C. §3729.

56.     Accordingly, Defendant, by and through its agents, officers, and employees, knowingly presented or caused to be presented false or fraudulent claims for payment or approval and knowingly made, used, caused to be made or used, false records or statements material to a false or fraudulent claim and/or knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government or knowingly concealed or knowingly

and improperly avoided or decreased an obligation to pay or transmit money or property to the Government in violation of 31 U.S.C. §3729.

57.    The United States has been damaged as a result of Defendant's violations of the False Claims Act in an amount to be proven at trial.  The United States is entitled to this sum as reimbursement for monies obtained by the Defendant for false claims submitted to the United States.

58.    The United States is entitled to three times the total damages sustained as a result of Defendant's violations of the 31 U.S.C. §3729.

59.    The United States is entitled to a civil penalty of not less than $5,500.00 and not more than $11,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 Note; Public Law 104-410) for each of Defendant's false claims.

60.    The Relator is entitled to reasonable attorney's fees and cost pursuant to 31 U.S.C. §3730(d)(1).

## COUNT IV
## VIOLATION OF THE WHISTLEBLOWER PROTECTION PROVISIONS
## OF THE FALSE CLAIMS ACT 31 U.S.C. §3730(h)

61.    Relator hereby incorporates and re-alleges all preceding paragraphs as if set forth fully herein.

62.    In an attempt to stop CPS from submitting false claims, Dr. Alt raised the issue of Point of Care testing and the overutilization of full panel testing with her supervisor, Dr. Kyle Longo in mid-February 2015. Dr. Longo responded that CPS doesn't believe in Point of Care testing and that they only perform full panel tests at CPS. Dr. Longo instructed Dr. Alt to test the CPS way. About one month later, in March 2015, Dr. Alt

17

was terminated for her efforts to stop CPS from submitting false claims for unnecessary full panel drug tests.

63.     Defendant discharged and otherwise discriminated against Relator, Suzanne Alt, in the terms and conditions of her employment, because of the lawful acts done by Dr. Alt in furtherance of her efforts to stop one or more violations of the False Claims Act by Defendant, Comprehensive Pain Specialists.

64.     Pursuant to the False Claims Act, Relator is entitled to reinstatement with the same seniority status that she would have had but for the discrimination, two times the amount of back pay, interest on back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorney's fees.

**PRAYER FOR RELIEF**

WHEREFORE, Relator prays for judgment

(a)     Ordering the Defendant to pay the United States Government three times its actual damages resulting from the Defendant's violations of the False Claims Act;

(b)     Ordering Defendant to pay the United States Government a civil penalty for each false claim as set forth in the False Claims Act;

(c)     Ordering Defendant to pay Relator monetary damages for its violation of 31 U.S.C. §3730 (h), the Whistleblower Protection Provision of the False Claims Act;

(d)     Awarding Relator an amount the Court decides is reasonable for collecting the civil penalty and monetary damages by pursuing this matter, which award, by statute shall not be less than 15% nor more than 25% of the proceeds of this action or

18

the settlement of any such claim, if the Government intervenes in the action and not less than 25% nor more than 30% if the Government declines to intervene in the action.

    (e)    Ordering the Defendant to pay Relator's attorney's fees and costs;

    (f)    Granting such other relief as the Court may deem just and proper.

**RELATOR HEREBY DEMANDS TRIAL BY STRUCK JURY.**

IRWIN VENICK, #4112
DOBBINS, VENICK, KUHN, AND
BYASSEE, PLLC
210 25th Avenue North, Suite 1010
Nashville, Tennessee 37203
Tel: (615) 321-5659
irwinv@dvlawfirm.com

DON MCKENNA ASB-6494-C66D
HARE, WYNN, NEWELL AND NEWTON, LLP
The Historic Massey Building
Suite 800
2025 Third Avenue North
Birmingham, AL 35203
Tel: (205) 328-5330
Fax: (205) 324-2165
don@hwnn.com

## CERTIFICATE OF SERVICE

    I hereby certify that I have served a copy of the above and foregoing pleading upon the following attorneys of record, by placing a copy of same in the United States mail, certified mail, postage prepaid, on this the _10_ day of _March_ 2016.

David Rivera
U.S. Attorney
Middle District of Tennessee

19

110 Ninth Avenue South
Suite A-961
Nashville, TN 37203


Loretta Lynch
Attorney General of the United States
Department of Justice
10th & Constitution Aves. N.E.
Washington, D.C.  20530

_____
Irwin Venick