# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA and** | ) | |
| **THE STATE OF TENNESSEE** *ex rel.* | ) | |
| *SUZANNE ALT et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:16-cv-0549** |
| | ) | **Judge Aleta A. Trauger** |
| **ANESTHESIA SERVICES** | ) | |
| **ASSOCIATES, PLLC, d/b/a** | ) | |
| **COMPREHENSIVE PAIN** | ) | |
| **SPECIALISTS,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

This matter was originally brought as a *qui tam* action by relator Suzanne Alt on March 9,

2016. (Doc. No. 1.) It was consolidated with several other pending *qui tam* actions on April 15,

2019. (Doc. No. 42.) After announcing their intent to intervene in part in April 2019 (Doc. Nos.

43, 44), the United States and the State of Tennessee (collectively, "the government" or "the

plaintiffs") filed their Consolidated Complaint in Intervention on July 22, 2019, asserting claims

under the False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "FCA"); the Tennessee Medicaid False

Claims Act, Tenn. Code Ann. §§ 71-5-182 to -185 (the "TMFCA"); the Federal Priority Statute,

31 U.S.C. § 3713; and common law theories of payment by mistake, unjust enrichment and fraud,

against numerous defendants, including Anesthesia Services Associates, PLLC d/b/a

Comprehensive Pain Specialists ("CPS"), Peter B. Kroll, M.D., John Davis, Steven R. Dickerson,

M.D., Gilberto A. Carrero, M.D., and Russell S. Smith, D.C. (*See* Consol. Compl. in Intervention,

Doc. No. 65.) Dr. Smith had not previously been identified as a defendant in any of the *qui tam*

Complaints.

Relators Jennifer Pressotto and Allison Chancellor filed Amended Complaints on July 17 and 22, 2019, respectively, both of which adopt and incorporate, in whole or in part, the claims asserted by the government but also maintain separate claims, including claims for retaliation under state and federal law. (Docs. Nos. 63, 66.) The separately maintained claims are not asserted against Smith.

Now before the court is Dr. Russell Smith's Motion to Dismiss (Doc. No. 104) and contemporaneously filed Memorandum of Law (Doc. No. 105), seeking dismissal of all claims asserted against him in the Consolidated Complaint, as well as in the relators' Amended Complaints, for failure to satisfy the particularity requirements of Rule 9(b) of the Federal Rules of Civil Procedure. The government has filed a Joint Memorandum in Opposition to Smith's Motion to Dismiss (Doc. No. 117), and Smith has filed a Reply (Doc. No. 118). The relators have not responded separately to the motion.

For the reasons set forth herein, the Motion to Dismiss will be granted, but without prejudice to the plaintiffs' ability to file a motion to amend the Consolidated Complaint.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

The government alleges, in essence, that the defendants either submitted false claims or caused others to submit false claims to Medicare and other government health care programs for urine drug testing, genetic testing, and psychological testing that was either non-reimbursable or medically unnecessary. (*See generally* Doc. No. 65.) More specifically, the Consolidated Complaint alleges that CPS, a Tennessee professional limited liability company with a principal place of business in Franklin, Tennessee, began operations in 2000. By 2011, it was operating over sixty pain management clinics across twelve states and employed approximately 250 health care providers, who saw approximately 48,000 patients per month. The principal physician-owners of

CPS included defendants Dickerson, Carrero, and Kroll ("Owners"). (*Id.* ¶ 23.)

In support of their claims, the plaintiffs allege the existence of a complex scheme perpetrated by the Owners and John Davis, CPS's Chief Executive Officer. CPS, through Davis and Owners, allegedly implemented unlawful policies and procedures that resulted in the submission and payment of false claims by various federal and state healthcare programs, including Medicare, TRICARE, Medicaid/TennCare, and CHAMPVA/Choice (the "Government Health Care Programs"). (*Id.* ¶¶ 3, 4, 6.) Dickerson was a founding member of CPS when it was formed as Skyline Anesthesia Services, PLLC in July 2000. (*Id.* ¶ 75.) Carrero joined the company in 2004 and Kroll joined in 2007. (*Id.* ¶¶ 76, 79.) Davis became CEO in 2011. The plaintiffs allege that CPS's scheme to submit false claims began in earnest after Davis joined the company. (*Id.* ¶ 82.)

The plaintiffs allege that CPS, through Davis and the Owners, took steps to ensure that other medical providers employed by CPS were ordering medically unnecessary testing, including by instituting a "standing order," pursuant to which urine drug testing was performed on virtually every single patient, regardless of patient risk levels. (*Id.* ¶ 4.) The standing order was allegedly executed by Kroll and Dickerson. (*Id.* ¶ 134.) CPS further maximized its profits by opening its own testing facility beginning in 2012, where urine drug testing was performed. (*Id.* ¶¶ 123–33.) Following the success of this program, CPS, through Davis and the Owners, expanded its policies and procedures to include submission of claims for genetic blood testing and psychological testing that allegedly did not meet requirements for payment and were not medically necessary. (*Id.* at ¶ 6.)

The plaintiffs also allege that Davis, with the knowledge of the Owners, adopted a bonus program that incentivized CPS's mid-level providers to order urine drug testing, genetic testing,

and psychological testing as well as other ancillary services. (*Id.* at ¶ 7.) The Owners and Davis allegedly produced and promulgated urine drug screening guidelines that resulted in the over-utilization of medically unnecessary tests. (*Id.* ¶ 166.) The Consolidated Complaint further alleges that Davis himself altered billing codes submitted by the providers, implemented a policy to bill, and obtain reimbursement, for non-reimbursable acupuncture, and entered into a scheme that allowed him to receive kickbacks for referring durable medical equipment ("DME") to an unaffiliated business. (*Id.* ¶¶ 9–12.) The plaintiffs allege that, as a result of this scheme, Dickerson directly submitted over seven hundred and fifty false claims; Carrero directly submitted approximately eight hundred false claims; and Kroll directly submitted or caused to be submitted over fifteen thousand false claims. (*Id.* ¶¶ 15–17.)

Regarding Smith specifically, the Consolidated Complaint alleges that Smith is a chiropractor who resides in Cleveland, Tennessee. (*Id.* ¶ 28.) In May 2013, CPS purchased the clinic owned by Smith in Cleveland and then entered into an agreement with Smith pursuant to which Smith continued to "oversee" his clinic and two other East Tennessee clinics owned by CPS. Smith did not personally treat patients at any of these clinics, but his compensation was based on the net revenue generated at the three clinics—94 percent of the revenue generated at the Cleveland clinic, 75 percent of all revenue collected for "ancillary services," and "substantial revenues" from the others. (*Id.* ¶¶ 8, 91.) The plaintiffs allege that Smith was "incentivized" by this compensation package "[t]o ensure that revenues were high." (*Id.* ¶¶ 8, 91.) Consequently, he "asserted [sic] pressure on the providers at his clinics, which resulted in unnecessary medical services and devices, including excessive and unnecessary urine and blood testing and the ordering of DME." (*Id.* ¶ 8.) The plaintiffs do not explain what form of pressure Smith exerted or what leverage he employed in exerting such pressure, other than to say that he "was attempting to

influence the clinical decision-making of the providers" practicing at the clinics he oversaw. (*Id.* ¶ 283.).

On July 14, 2014, AdvanceMed, a Zone Program Integrity Contractor ("ZPIC") for the Centers for Medicare and Medicaid Services ("CMS") performed an audit covering claims from January 1, 2012 to May 31, 2014. (*Id.* ¶ 152.) In response to the audit, CPS personnel conducted an internal review of claims and providers and noted that several providers at the East Tennessee clinics, and particularly at the Cleveland clinic, were "ordering [urine drug screens] on every patient on every visit." (*Id.* ¶ 163.) Despite training conducted with these providers, the pattern continued. (*Id.* ¶ 170.) CPS decided to conduct individual training for these providers, but this training, too, apparently had little effect. (*Id.* ¶ 170, 180.)

One particular nurse practitioner at the Cleveland, Tennessee clinic, Anita Bayles, failed to change her practice of over-ordering both urine drug tests and opioids. Although CPS's Compliance Committee voted to terminate Bayles' employment in September 2016, after a conference call involving members of the Compliance Committee, Dr. Niendorff (who was Bayles' supervising physician), and Davis, Davis made the decision to keep Bayles on staff because of her revenue-generating abilities. (*Id.* ¶¶ 171–73.)

From 2011 to February 25, 2018, Cahaba Government Benefit Administrators, LLC ("Cahaba") was the Medicare Administrative Contractor ("MAC") that administered Medicare Part B claims in Tennessee. In October 2016, Cahaba notified CPS that seven providers at the East Tennessee clinics were being placed on prepayment review, largely for over-utilization of urine drug testing, which meant that claims submitted by these providers would not be processed until a review of the documentation supporting their claims confirmed that the services were medically necessary and reimbursable. (*Id.* ¶ 178.)

The government alleges that the Owners, Davis, and Smith all profited from the excessive urine drug testing at the clinics managed by Smith. (*Id.* ¶¶ 197, 198; *see also id.* ¶ 415.) The Consolidated Complaint provides specific examples of patients who Smith has admitted underwent medically unnecessary urine drug screens in 2016 and 2017.[1] (*Id.* ¶ 210.) They allege that, if the Government Health Care Programs had known that the testing was not medically necessary and that the providers submitting the claims lacked the requisite medical documentation, they would have denied payment for the claims (*Id.* ¶ 211.)

Sarah Trent, CPS's Director of Clinician Education, has "acknowledged that mid-level providers ordered ancillary services that were not medically necessary because of CPS's bonus structure and pressure put on them expressly by Davis and Smith." (*Id.* ¶¶ 265.)

The Consolidated Complaint also details the compensation packages and bonuses provided to some of CPS's medical providers, including several at the East Tennessee clinics, that incentivized them to order unnecessary medical tests and services. The doctors at the East Tennessee clinics with astounding compensation packages included Paul Pinson, M.D., whose employment agreement provided for a monthly salary of $37,500, plus a bonus based on "overall productivity" of the Cleveland clinic where he practiced (*id.* ¶ 267), and Cynthia Niendorff, M.D., whose employment agreement, which was signed by Davis, provided for "only" thirty percent of the revenues collected from services she personally provided during the first year, an additional ten percent of all revenue collected from services rendered by nurse practitioners and physician assistants under her supervision (including Anita Bayles), and an unspecified share of "ancillary

---

[1] The government states that examples it provides are drawn from a *qui tam* complaint that Smith and others filed against CPS in the United States District Court for the Eastern District of Tennessee, which was transferred to this court. (Doc. No. 65, at 49 n.6) *See Niendorff v. Anesthesia Services Associates, PLLC*, No. 3:18-cv-1025 (M.D. Tenn. Sept. 5, 2017) (Complaint). The United States declined to intervene in that action and it was voluntarily dismissed on April 30, 2019.

services" revenue (*id.* ¶ 271). In addition, she received a salary of $39,500 per month for providing supervisory services at both the Cleveland and Chattanooga clinics, or only $19,750 per month if she provided such services only at the Cleveland location. (*Id.*)

Smith was terminated "for cause" in June 2017. (*Id.* ¶ 285.) The Consolidated Complaint does not specify the cause other than to imply that it was because Smith was pressuring medical providers to provide unnecessary testing and services.

Based on these allegations, the Consolidated Complaint asserts claims against Smith specifically for (1) violating 31 U.S.C. § 3729(a)(1)(A) and Tenn. Code Ann. § 71-5-182(a)(1)(A) by causing false claims for testing to be presented for which the Government Health Care Programs do not reimburse or that were not medically necessary (Doc. No. 65 ¶¶ 434–38, Count I); (2) violating 31 U.S.C. § 3729(a)(1)(B) and Tenn. Code Ann. § 71-5-182(a)(1)(B) by causing false records or statements to be made or used related to testing, including the false certifications and representations on forms CMS 1500 and the electronic version thereof, to obtain approval for and payment by the United States and Tennessee for false or fraudulent claims (Doc. No. 65 ¶¶ 439–44, Count II); and (3) violating 31 U.S.C. § 3729(a)(1)(G) and Tenn. Code Ann. § 71-5-182(a)(1)(D), by knowingly making, using, or causing to be made or used false records or statements material to obligations to pay or transmit money to the government (Doc. No. 65 ¶¶ 445–48, Count III). The Consolidated Complaint also asserts common law claims against Smith for payment by mistake, unjust enrichment, and fraud. (*Id.* ¶¶ 462–77, Counts VI, VII, and VIII.)[2]

Smith now seeks dismissal of all claims against him in the Consolidated Complaint and in the Amended Complaints filed by the relators, to the extent the latter adopt and re-allege the same claims. (*See* Doc. Nos. 63, 66.)

---

[2] Counts IV and V are not directed to Smith.

## II. STANDARD OF REVIEW

Two standards of review govern the consideration of a motion to dismiss claims under the False Claims Act. First, under Rule 12(b)(6), "all well-pleaded material allegations of the pleadings" are accepted as true, and those allegations must "be sufficient to give notice to the defendant as to what claims are alleged, and . . . plead 'sufficient factual matter' to render the legal claim plausible, *i.e.*, more than merely possible." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009)). That is, under the general pleading standards of Rule 8, the factual allegations in the complaint need not be detailed, although "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Second, "[t]he heightened pleading standard set forth in Rule 9(b) applies to complaints brought under the FCA." *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 563 (6th Cir. 2003). Under that rule, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity," while "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R. Civ. P. 9(b). To comply with Rule 9(b), "a plaintiff, at a minimum, must 'allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'" *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 504 (6th Cir. 2007) (quoting *Coffey v. Foamex L.P.*, 2 F.3d 157, 161–62 (6th Cir. 1993)).

## III. STATUTORY FRAMEWORK

The FCA "imposes civil liability on any person who knowingly submits false claims to the government." *U.S. ex rel. Digital Healthcare, Inc. v. Affiliated Comput. Servs., Inc.*, 778 F. Supp. 2d 37, 44–45 (D.D.C. 2011) (citing 31 U.S.C. §§ 3729–3733). Section 3729(a)(1)(A) creates

liability for "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). To state a "presentment" claim under the FCA, the government must sufficiently plead that (1) the defendant presented, or caused to be presented, a claim for payment or approval; (2) the claim was false or fraudulent; and (3) the defendant's acts were undertaken "knowingly," meaning with actual knowledge of the information, or with deliberate ignorance or reckless disregard for the truth or falsity of the claim. *U.S. ex rel. Prather v. Brookdale Senior Living Cmties., Inc.*, 838 F.3d 750, 761 (6th Cir. 2016).

Subsection 3729(a)(1)(B) imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B); *see also id.* § 3730(b) ("A person may bring a civil action for a violation of section 3729"). To state a claim under this provision, the plaintiff must sufficiently plead

> [1] that the defendant [made] a false statement or create[d] a false record [2] with actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity of the information; [3] that the defendant . . . submitted a claim for payment to the federal government; . . . and [4] that the false statement or record [was] material to the Government's decision to make the payment sought in the defendant's claim.

*U.S. ex rel. Sheldon v. Kettering Health Network*, 816 F.3d 399, 408 (6th Cir. 2016) (quoting *U.S. ex rel. SNAPP, Inc. v. Ford Motor Co.*, 618 F.3d 505, 509 (6th Cir. 2010)).

To state a claim under § 3729(a)(1)(G),[3] the plaintiff must adequately plead "that the defendant made [or caused to be made] a false record or statement at a time that the defendant owed to the government an obligation—a duty to pay money or property." *U.S. ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 916 (6th Cir. 2017) (citations and internal quotation

---

[3] Another part of § 3729(a)(1)(G) creates a cause of action against defendants who "received overpayments from the government and failed to refund those payments." *U.S. ex rel. Harper v. Muskingum Watershed Conservancy Dist.*, 842 F.3d 430, 433 (6th Cir. 2016). This type of claim is often referred to as the "reverse-false-claim." *Id.* The Consolidated Complaint states a claim for reverse false claims in Count IV, which is not aimed at Smith.

marks denied), *cert. denied sub nom. U.S. ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 138 S. Ct. 2582 (2018).

The elements of a claim under the TMFCA are "virtually identical" to those of an FCA claim. *United States v. UT Med. Grp., Inc.*, No. 2:12-CV-02139-JPM-TMP, 2014 WL 12611244, at *4 n.2 (W.D. Tenn. May 21, 2014) (comparing 31 U.S.C. § 3729(a)(1)(A) ("[A]ny person who[] knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval . . . is liable to the United States Government for a civil penalty[.]) *with* Tenn. Code Ann. § 71-5-182(a)(1)(A) ("[A]ny person who[] [k]nowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval under the medicaid program . . . is liable to the state for a civil penalty[.]"). "Accordingly, the analysis of the sufficiency of the pleading is equally applicable to both statutory claims." *Id.*; *accord U.S. ex rel. Nudelman v. Int'l Rehab. Assocs., Inc.*, No. CIV.A. 00-1837, 2006 WL 925035, at *12 (E.D. Pa. Apr. 4, 2006) (applying the same analysis to FCA and TMFCA claims, noting that the state statute "read[s] similarly and [is] substantively the same as the FCA").

The submission of a false claim for reimbursement under any of the Government Health Care Programs constitutes a violation of the FCA, or, if the claim is submitted to the State of Tennessee, a violation of the TMFCA. As relevant here, Medicare is a federal health insurance program for the elderly and people with disabilities. *See* 42 U.S.C. § 1395c (2012). Medicare Part B, which provides outpatient coverage for, among other things, diagnostic laboratory tests, *see* 42 C.F.R. § 410.32 (2016), only covers medical services that are "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member," 42 U.S.C. § 1395y(a)(1)(A). "[Laboratory t]ests that are performed in the absence of signs, symptoms, complaints, personal history of disease, or injury are not covered except when

there is a statutory provision that explicitly covers tests for screening as described." Medicare Claims Processing Manual: Chapter 16—Laboratory Services § 120.1, available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104C16.pdf (last visited December 17, 2019). Likewise, each of the other Government Health Care Programs expressly provides coverage only for items and services that are actually rendered, and reasonable and medically necessary, and they will deny payment when this is not the case.

An entity seeking reimbursement for services provided to patients covered by Medicare or another Government Health Care Program generally must submit a CMS Form 1500, or its electronic equivalent, to the appropriate MAC. *See U.S. ex rel. Hobbs v. MedQuest Assocs.*, 711 F.3d 707, 711 (6th Cir. 2013). "The[ CMS–1500] form[] reflect[s] the treatment or services provided and identif[ies] the [entity that] provided them. Tests, supplies, and services are correlated to a series of unique numbers, called CPT codes, which quickly convey to the [claims processor] what reimbursable expenses the [entity] has incurred." *Id.* at 711. The CMS Form 1500 requires the entity to certify that, among other things, "the services on this form were medically necessary." Health Insurance Claim Form (Form 1500) at 2, available at https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/CMS1500.pdf (last visited December 17, 2019).

## IV.    DISCUSSION

The government's theories of recovery against the Owners and Davis are premised upon its allegations that the Owners and various CPS medical providers submitted thousands of claims for services that were not actually provided, that they knew or should have known were expressly not covered by the Government Health Care Programs, or that were medically unnecessary. (*See, e.g.*, Doc. No. 113, at 19.) Its claims against Smith are somewhat different. The government does not allege that Smith had any ownership interest in CPS, that he had any control over, or input

into, CPS's policies and procedures, including the policies relating to urine drug testing or other testing, or that he personally treated patients or submitted false claims for reimbursement to the Government Health Care Programs. Instead, it asserts that Smith was financially incentivized by CPS to maximize the claims submitted by providers at the three East Tennessee Clinics that he oversaw and that, "motivated by his own greed," he "cause[d] CPS providers in the clinics he oversaw to engage in testing that was not reasonable or medically necessary." (Doc. No. 117, at 6.) It claims that, "[a]s a result of Smith's pressure," the providers at the clinics he oversaw submitted false claims that were paid by the Government Health Care Programs to CPS, which later paid Smith based on the revenues his clinics received from submitting such claims. (*Id.*)

Smith argues that the allegations in the Consolidated Complaint are insufficient to hold him liable for the allegedly false claims submitted by others, based simply on his managerial role and the purported "pressure" he placed on the providers at the clinics he managed. Specifically, he asserts that the § 3729(a)(1)(A) claims (for "causing" the presentment of false claims to the government) and the § 3729(a)(1)(B) claims (for knowingly causing the making or use of a "false record or statement material to a false or fraudulent claim") fail, because the government has not pleaded a causal link between Smith's conduct and the submission of false claims with the particularity required by Rule 9(b). Similarly, he asserts that the Consolidated Complaint fails to plead facts showing that Smith personally had any involvement in the "making of a false record or statement" related to claims for government payment at a time when CPS owed money back to the government, for purposes of a claim under § 3729(a)(1)(G). Smith further argues that the common law fraud claim against him fails for essentially the same reasons—that the government has not alleged fraud on his part with the requisite particularity. He asserts that the claims for payment by mistake and unjust enrichment must be dismissed because he did not receive payment

through his control of CPS.

### A. The FCA Claims

As set forth above, the Consolidated Complaint alleges, very broadly, that Smith "caused" others to violate the FCA by "pressuring" the providers in the clinics he oversaw to submit false claims for payment. Smith seeks dismissal of all of the FCA claims on the grounds that the plaintiffs have not alleged how he exerted such pressure with the particularity required by Rule 9(b).

In response, the government purports to construe Smith's motion as asserting that he cannot be liable because he did not "directly cause" the submission of false claims and that indirect causation is sufficient. (Doc. No. 117, at 16.) It argues both that the Consolidated Complaint "[d]etails [h]ow Smith [c]aused the [f]raudulent [c]onduct" and that "every detail about conduct causing the false claims need not be stated with particularity at this stage of the litigation." (Doc. No. 117, at 17.) It explains:

> Here, the Complaint clearly states the "who" (Smith), "what" (pressured providers in his clinics, several of whom are named, to order unnecessary testing and services and submit false claims related to such conduct), "when" (from 2013 to 2017), "where" (the East Tennessee clinics Smith managed), and "how" (by submitting false claims that the Government Health Care Programs reimbursed CPS and for which Smith received payment from CPS) of the alleged fraud.

(Doc. No. 117, at 17.) And it claims that Smith's "knowledge" of the false claims is proved by the fact that the Consolidated Complaint simply reiterates the allegations Smith made in his own *qui tam* Complaint. It insists that Smith's denial of the allegations is belied by the fact that CPS's Answer to the Consolidated Complaint "admitted that Smith was pressuring his providers to submit false claims." (Doc. No. 117, at 18.) Thus, the government asserts, the "time, place, and content" of the alleged fraud have been pleaded with the requisite particularity.

The court is not persuaded. The "how" relevant to the claims against Smith asks "how did

Smith cause the providers to submit false claims?" The Consolidated Complaint purports to answer this question very succinctly: Smith "pressured" the providers. The Consolidated Complaint includes no explanation of how he pressured them. The court finds that this assertion does not satisfy Rule 9(b).

The cases cited by the plaintiffs in which allegations of "pressuring" were deemed to adequately allege a causal connection between the defendants' actions and the submission of false claims effectively confirm that the allegations here are deficient. For example, in *United States ex rel. Hayward v. SavaSeniorCare, LLC*, Nos. 3:11-00821, 3:15-00404, 3:15-01102, 2016 WL 5395949 (M.D. Tenn. Sept. 27, 2016) (Sharp, J.), the FCA claims against the corporate defendants were based largely on "pressure" exerted on providers employed by the corporate defendants to "upcode" and otherwise engage in medically unnecessary and unreasonable practices in order to maximize the value of the claims for reimbursement submitted to Medicare. As described by the court, however, the Complaint described in some detail the form this pressure (embodied in corporate policy) took. For instance:

> Constant pressure was placed on both regional and facility-level employees to make their ever-increasing budgets. This pressure "was top-down, nationwide, and exerted by both rehabilitation and operations corporate-level employees." Enforcement of the goals was achieved through various devices, including action plans, performance evaluations, calls and visits to facilities, threats of repercussions or termination for poor performers, and bonuses for those that did well. Facilities were also ranked—those that performed well were applauded, while those that did not were singled out and "publicly shame[d] . . . into improving their performance."

*Id.* at *4. In other words, the Complaint described the type of pressure involved and how it was exerted. In addition, the corporate defendants actually set policy and employed the individuals upon whom they exerted pressure. Although the defendants argued that the Complaint did not show that "corporate pressure or any specific emails reflecting corporate pressure actually resulted in unnecessary therapy" received by a Medicare patient, *id.* at *10, the court rejected this and the

defendants' other arguments pertaining to the particularity of the allegations, stating: "[a] complaint sufficiently pleads the time, place, and content of the alleged misrepresentation so long as it 'ensure[s] that [the] defendant possesses sufficient information to respond to an allegation of fraud; providing the defendant with sufficient information to respond is Rule 9's 'overarching purpose.'" *Id.* at *11 (quoting *U.S. ex rel. Sheldon v. Kettering Health Network*, 816 F.3d 399, 411 (6th Cir. 2016)).

Two other cases from this district have found the allegations of causation to be sufficiently particular, but in both, as in *Hayward*, the allegations in the Complaint described in some detail the defendant's participation in the presentation of false claims. *See U.S. ex rel. Norris v. Anderson*, 271 F. Supp. 3d 950, 995 (M.D. Tenn. 2017) (Crenshaw, C.J.) (allowing FCA claims to proceed based on allegations of indirect conduct in causing claims to be submitted, where the government alleged that the defendant, "acting personally," "instructed billing employees at the pain management clinics" owned by his "alter ego" company to" engage in "upcoding," that is, to bill all office visits under a particular CPT code that triggered a higher reimbursement rate, even though he knew the clinics were not providing services payable under that code); *U.S. ex rel. Fry v. Guidant Corp.*, No. 3:03-0842, 2006 WL 2633740, at *11–12 (M.D. Tenn. 2006) (denying motion to dismiss where the Complaint alleged that the corporate defendant engaged in a scheme to defraud hospitals and to cause them to submit false claims through a marketing scheme directed to doctors, pursuant to which salesmen told the doctors about warranty rebates and "upgrade" credits to which the hospitals for which the doctors worked would be entitled, but then the salesmen were affirmatively directed to, and did, remove any information about the rebates and credits from the packaging of the defendant's devices, to ensure that hospital personnel never saw

or learned about them).[4]

Conversely, the court finds particularly instructive a case the plaintiffs attempt to distinguish. In *United States v. Carolina Liquid Chemistries, Corp.*, No. 13-cv-01497, 2019 WL 3207851 (N.D. Cal. Jul. 16, 2019), the claims against the defendant were based on a marketing scheme that, the plaintiffs alleged, caused the providers using the defendant's product to submit false claims for reimbursement, overcharging Medicare and Medicaid for services that were actually performed. The plaintiffs alleged that the defendant "systematically marketed" its urine drug testing machines by falsely representing that the machines could perform "high complexity 'quantitative' drug testing." *Id.* at *1. The physicians and clinics to which the defendant marketed its products allegedly "followed [the defendant's] instructions to code tests performed on those machines as high complexity" and, as a result, submitted false claims. *Id.*

The court found that the Complaint adequately alleged that false claims were submitted by the providers and clinics. However, regarding the defendant's responsibility for those submissions—that is, the causal connection between the defendant's actions and the submission of false claims by others—the district court noted that the plaintiffs were required to "describe the misconduct—here, the marketing of [the defendant's] products—with the particularity required by Rule 9(b)." *Id.* at *7. The court continued:

> Relators have described the reason that the alleged marketing was fraudulent, identifying the specific codes that should not have been charged, and the precise amounts that the government would have overpaid as a result. Yet Relators' complaint is otherwise devoid of the details of Carolina Liquid's marketing.

_____

[4] The plaintiffs also cite a case from the Williamson County Circuit Court denying motions to dismiss TFMCA claims under state law where the individual defendants were alleged to have "pressured" employees of the corporate defendants, which were owned and operated by the individual defendants, to engage in fraudulent billing practices. *Tennessee v Pain MD, LLC*, No. 2017-262, 2017 WL 4862529, at *14 (Williamson Cty. Cir. Ct. Oct. 12, 2017). Besides the fact that this case is of no precedential or persuasive value in this court, the opinion does not discuss in any detail the factual allegations in the Complaint.

Relators generally allege that Patricia Shugart chaired internal meetings instructing sales representatives in these practices, but do not specify any details of these meetings or when they took place. Similarly, Relators quote from alleged Carolina Liquid documents, but do not identify any specific customers who were presented with these documents or the circumstances of any discussions. In short, Relators' description of this fraudulent marketing scheme, on which their FCA claim hinges, falls short of providing the "who, what, when, where and how["] of the alleged fraud.

A particularized theory of a fraudulent scheme, absent sufficient details to show that it took place, is insufficient to satisfy Rule 9(b).

*Id.* at *7 (citations and internal quotation marks omitted).

Likewise, in this case, the plaintiffs have described the financial incentives that might have prompted Smith to pressure the providers in the clinics he supervised; they have alleged facts that arguably show that providers at those clinics submitted false claims. However, the Consolidated Complaint does not contain any details—what, when, where or how—about the pressure Smith purportedly exerted on the providers at the clinics he oversaw.[5] *See Ibanez*, 874 F.3d at 914–15 (holding that, when FCA relators allege a complex scheme by which a defendant "caused false claims to be submitted to the government," "Rule 9(b) requires [plaintiffs] to adequately allege the entire chain—from start to finish—to fairly show defendants caused false claims to be filed"). Like the plaintiffs in *Carolina Liquid*, the plaintiffs here have a "particularized theory of a fraudulent scheme" but without any "details to show that it took place." [6]

The court finds, in sum, that the Consolidated Complaint fails to allege that Smith "caused" the submission of false claims with the particularity required by Rule 9(b). The government's

---

[5] The court also notes that the Consolidated Complaint alleges that CPS entered into compensation packages with a number of the providers at the East Tennessee clinics that likely would have been sufficient, even without any "pressure" from Smith, to cause those providers to perform medically unnecessary tests and bill the Government Health Care Programs for them.

[6] The pleading in *Carolina Liquid* arguably provided more detail regarding causation than the Consolidated Complaint does in this case.

assertion that CPS has "admitted" much of Smith's unlawful conduct is simply beside the point. The controlling question is whether the allegations in the Consolidated Complaint are sufficient to state a claim in the first place. Because the court cannot infer from the allegations in the Consolidated Complaint that Smith caused false claims to be submitted, Smith's Motion to Dismiss the FCA claims will be granted.

Because the Consolidated Complaint fails to adequately allege causation, the court does not reach the question of scienter, other than to note that the government's assertion that Smith's knowledge of the false claims is established by the fact that he filed a *qui tam* action, detailing allegedly false claims, is irrelevant to establish that he knowingly *caused* the alleged violations.[7] Moreover, mere knowledge of fraudulent conduct by another, *per se*, does not give rise to liability under the FCA or the TMFCA. *Accord United States v. Executive Health Resources, Inc.*, 196 F. Supp. 3d 477, 513 (E.D. Pa. 2016); *see also U.S. ex rel. Piacentile v. Wolk*, No. 93-5773, 1995 WL 20833, at *4 (E.D. Pa. Jan. 17, 1995) ("An individual's failure to inform the government of false statements made by another does not constitute fraud."). If it did, every relator could face liability under the FCA.

**B.     Common Law Fraud**

Smith argues that the Consolidated Complaint also does not allege facts supporting a common law fraud claim with the particularity required by Rule 9(b). The government concedes that Smith has correctly articulated the elements of a common-law fraud claim. It argues, however, that its claim under the common law is adequately pleaded for the same reasons as the FCA claims:

> Here, the Complaint does not assert that Smith made fraudulent statements to his providers to induce them to order unnecessary testing and engage in the fraud.

---

[7] It does not appear that the government has brought FCA claims against the other relators who, along with Smith, filed that *qui tam* action, even though one of them, Cynthia Niendorff, was allegedly a provider who personally submitted false claims to the government.

> Rather, the fraudulent representations are made in the claims submitted, which are stated with particularity along with the entire fraudulent scheme. Thus, for the same reasons that the FCA claims are sufficiently plead[ed], the common law claim for fraud also should proceed.

(Doc. No. 117, at 24–25.)

The Supreme Court long ago defined the elements of federal common law fraud as including: "(1) a false representation (2) in reference to a material fact (3) made with knowledge of its falsity (4) and with the intent to deceive (5) with action taken in reliance upon the representation." *Pence v. United States*, 316 U.S. 332, 338 (1942) (citations omitted).[8]

The Consolidated Complaint does not allege a false representation by Smith. Moreover, even assuming that causing another to engage in a false representation can give rise to a claim for common law fraud, the government, as set forth above, has not alleged with the requisite particularity that Smith caused a false representation. This claim too is subject to dismissal.

### C.     Payment by Mistake and Unjust Enrichment

The government also asserts common law claims of unjust enrichment and payment by mistake, "which in essence are alternative pleadings to its claims under the False Claims Act." *United States v. United Techs. Corp.*, 626 F.3d 313, 323 (6th Cir. 2010). These claims are premised upon the same set of facts as the FCA and fraud claims. While not every unjust enrichment claim involves fraud, *see id.*, the claims asserted in this case are premised upon fraud. Because, as set forth above, the court finds that the Consolidated Complaint fails to allege facts supporting fraud with the requisite particularity, the payment by mistake and unjust enrichment claims, which are

---

[8] Tennessee law defines fraud similarly as requiring proof of: "(1) an intentional misrepresentation of a material fact, (2) knowledge of the representation's falsity, (3) an injury caused by reasonable reliance on the representation, and (4) the requirement that the misrepresentation involve a past or existing fact." *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 40 (Tenn. Ct. App. 2006)

also premised upon fraud, necessarily fail as well.

The court further finds that the parties have not adequately briefed the question of whether Smith may be liable under these theories, given that he did not submit false claims or receive money directly from the government. Consequently, the court declines to reach the legal merits of these claims.

### D.      Leave to Amend

In a footnote, the government requests that it be granted leave to amend the Consolidated Complaint to plead "Smith's pressuring tactics" with greater particularity, in the event the court grants the defendant's motion.

In *Bledsoe*, the Sixth Circuit reaffirmed the general rule, in the context of a motion to dismiss FCA claims, that, "where a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice." 342 F.3d at 644 (quoting *EEOC v. Ohio Edison Co.*, 7 F.3d 541, 546 (6th Cir. 1993)). On the other hand, denial of a motion for leave to amend may be appropriate, "where there is 'undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc.'" *id.* (quoting *Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002)). In *Bledsoe*, the Sixth Circuit concluded that the district court had abused its discretion in dismissing the claims with prejudice, in light of the fact that the law at the time was unsettled as to whether Rule 9 applied to FCA claims; the relator was not previously on notice that the allegations in the complaint did not comply with Rule 9(b); there was no evidence of undue delay or undue prejudice to the defendant by allowing amendment; and there was "some indication in the record" that the relator possessed additional information that could have allowed him to plead fraud with the requisite particularity.

In this case, although the first *qui tam* action was filed in 2016, none of the *qui tam* Complaints named Smith as a defendant. The Consolidated Complaint naming Smith as a defendant was not filed until July 2019, and this Memorandum constitutes the first notice to the government that its fraud allegations against Smith do not satisfy Rule 9. Smith's Reply did not address the plaintiffs' request for leave to amend. Under these circumstances, the court will dismiss the claims against Smith without prejudice. In order to amend the Consolidated Complaint, however, the government will be required to file a formal motion for leave to amend, attached to the proposed amended pleading, within the time frame specified by the accompanying Order.

## V.      CONCLUSION

For the reasons set forth herein, the court will grant Russell Smith's Motion to Dismiss (Doc. No. 104.) All claims against defendant Smith will be dismissed without prejudice to the government's ability to seek leave to amend the Consolidated Complaint. An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge