# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA and** | ) | |
| **THE STATE OF TENNESSEE** *ex rel.* | ) | |
| **SUZANNE ALT** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:16-cv-0549** |
| | ) | **Judge Aleta A. Trauger** |
| **ANESTHESIA SERVICES** | ) | |
| **ASSOCIATES, PLLC, d/b/a** | ) | |
| **COMPREHENSIVE PAIN** | ) | |
| **SPECIALISTS,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Before the court is the Joint Motion to Allocate Relator Share and Attorney Fee and Expenses ("Motion to Allocate") (Doc. No. 184), filed along with a Memorandum in Support thereof (Doc. No. 185) by relators Suzanne Alt, Mary Butner, Dana Brown, and Jennifer Pressotto (the "Moving Relators"). Relator Allison Chancellor has filed a series of responses to the motion, the last of which is styled as her Second Amended Memorandum in Opposition to the Moving Parties' Joint Motion to Allocate Relator Share and Attorney Fees and Expenses (Doc. No. 193), which the court understands to supersede Chancellor's previous filings in response to the Motion to Allocate. The Moving Relators filed a Reply. (Doc. No. 194.)

In addition, Chancellor has filed a *pro se* Motion to Be Deemed First-to-File Regarding Specimen Validity ("SVT"), Psychological ("iPAD"), and Pharmacogenetic ("Genetic") Testing (and Urine Drug Testing if the Court Determines Chancellor is First-to-File) as to the United States' and Tennessee's Settlement with CPS (Doc. No. 195), along with a supporting

memorandum (Doc. No. 196), which, if granted, would affect the allocation of proceeds of the settlement reserved for the relators.[1]

For the reasons set forth herein, the Moving Relators' Motion to Allocate will be granted in part and denied in part, and Chancellor's Motion to Be Deemed First to File will be denied.

## I.    PROCEDURAL BACKGROUND

Relator Suzanne Alt filed her whistleblower complaint against defendant Anesthesia Associates, PLLC d/b/a Comprehensive Pain Specialists ("CPS") on March 9, 2016; relators Butner and Brown jointly filed their whistleblower complaint on March 11, 2016; relator Pressotto filed the third complaint on July 18, 2016; and relator Chancellor filed her whistleblower complaint in the Southern District of Illinois on October 27, 2016.[2] Chancellor's case was eventually transferred to the Middle District of Tennessee and consolidated with the other pending *qui tam* cases. The United States and the State of Tennessee (collectively, "the Government") filed a Notice of Election to Intervene, and Decline to Intervene, in Parts of this Consolidated Action (Doc. No. 43), and a Complaint in Intervention was filed on July 19, 2019 (Doc. No. 65). By then, it was apparently already clear that the funds available to pay any settlement or judgment would be far less than the Government's damages, as CPS had ceased operations.

In April 2020, the court granted the parties' joint motion to extend all deadlines while the parties engaged in mediation and settlement discussions. As of July 2020, the parties had agreed to the basic terms of a settlement agreement with CPS for $2,196,663.94 (the "Suspended

---

[1] Chancellor was represented by counsel until January 19, 2021, when the court granted her attorneys' Amended Motion to Withdraw. (Doc. No. 174.) Having been unable to procure successor counsel, she has proceeded *pro se* since that time.

[2] A fifth whistleblower complaint was filed on May 2, 2017, making allegations that had already been made by the previous relators. That case was voluntarily dismissed on August 24, 2020 (Doc. No. 162), and the relators who filed that case were not included in the ultimate settlement of the consolidated case.

Amount"), the value of the funds then held by the Government in a payment suspension account, with an additional $138,000 to be contributed to the settlement pool by CPS for the relators' non-intervened claims and attorney's fees. (*See* Doc. No. 166-1, at 6, 5). According to the Settlement Agreement executed by all of the parties,[3] CPS ultimately agreed to pay the total settlement amount of $2,964,663.93.[4] (Settlement Agreement ¶ 1.) Defendant Peter Kroll separately agreed to pay $150,000 (the "Kroll Settlement Amount"). (*Id.* ¶ 2.)

A proposed version of the Settlement Agreement that was not actually adopted by the parties ("Proposed Settlement") indicates that the total Relators' Share ($610,684.62) is made up of $589,332.79 from the CPS Settlement Amount,[5] to be divided among all of the relators, plus an additional $21,351.83 from the Kroll Settlement Amount, to be paid to relators Butner and Brown.[6] (*See* Doc. No. 175-1 ¶ 3 n.2.) The Proposed Settlement anticipated that the Relators' Share would be allocated as follows: Alt to receive $212,832.59; Butner and Brown together to receive $30,585.57, plus $21,351.83 from the Kroll Settlement Amount; Pressotto to receive $31,951.74; and Chancellor to receive $313,952.89. (Doc. No. 175-1, at 18 ¶ 3 n.2.) These allocations were based on the Government's estimates of potential damages attributable to each of the different claims in which it had intervened and a *pro rata* allocation of the Relators' Share to each of the relators with respect to the settled claims for which they were deemed the "first to file." (*See* Doc.

---

[3] A copy of the final, fully executed Settlement Agreement was emailed to the court on April 16, 2021, but it has never actually been filed in the court's docket.

[4] This figure likely contains a typographical error. It appears that the parties intended to settle for $2,946,663.94, or the sum of $2,196,663.94 and $750,000 (*see* Settlement Agreement ¶ 1(a) and (b)), rather than $2,964,663.94.

[5] This figure represents twenty percent of $2,946,663.94.

[6] According to the Moving Relators, the Government determined that "[a]ny Relator share payment out of the Kroll Settlement amount was properly payable to Butner and Brown" (Doc. No. 185, at 6 n.2), as they were the only relators to name Kroll as a defendant.

No. 185, at 5–6.) The charts that the Government apparently provided to the relators, and which the relators have supplied to the court in their respective motions, reflect the Government's assessment of the total value of each of the intervened and settled claims, whom the Government deemed the "first to file" each claim, and the portion of the settlement traceable to each claim, as follows:

| Claim[7] | US Damages | TN Damages | US + TN Combined |
|---|---|---|---|
| UDS | $3,000,000 | $300,000 | $3,300,000 |
| iPad | $2,400,000 | $1,000,000 | $3,400,000 |
| Genetic | $2,000,000 | $500,000 | $2,500,000 |
| SVT | $1,000,000 | $275,000 | $1,275,000 |
| P-Stim | $150,000 | $450,000 | $600,000 |
|  | $8,550,000 | $2,525,000 | $11,075,000 |

| Claim | US Damages % | TN Damages % |
|---|---|---|
| UDS | 35.09% | 11.88% |
| iPad | 28.07% | 39.60% |
| Genetic | 23.39% | 19.80% |
| SVT | 11.70% | 10.89% |
| P-Stim | 1.75% | 17.82% |
|  | 100% | 100% |

| Settlement from CPS | $2,946,663.94 |
|---|---|
| CPS US Portion | 77.20% |
| CPS TN Portion | 22.80% |
| CPS US &TN Relators' % | 20.00% |
| CPS US Relators' Share | $454,964.91 |
| CPS TN Relators' Share | $134,367.88 |
| Total Relators' Share | $589,332.79 |

---

[7] "UDS" refers to Urine Drug Screening; "iPad" refers to a depression screening test conducted on iPads; "Genetic" refers to various pharmacogenetic blood tests; "SVT" stands for Specimen Validity Testing; and "P-Stim" refers to a non-covered acupuncture device.

| Relator | First-To-File on Settled Claims | US Damages % | TN Damages % | Estimated US Relator's Share | Estimated TN Relator's Share | Estimated Total Relator's Share |
|---|---|---|---|---|---|---|
| Alt | US: UDS/SVT | 46.78% | 0.00% | $212,832.59 | | $212,832.59 |
| Butner/Brown | TN: UDS/SVT | 0.00% | 22.77% | | $30,595.57 | $30,595.57 |
| Pressotto | US: P-Stim TN: P-Stim | 1.76% | 17.82% | $8,007.38 | $23,944.36 | $31,951.74 |
| Chancellor | US: iPad, Genetic TN: iPad, Genetic | 51.46% | 59.41% | $234,124.94 | $79,827.95 | $313,952.89 |
| | | 100.00% | 100.00% | $454,964.91 | $134,367.88 | $589,332.79 |

(*See* Doc. No. 196, at 27; *see also* Doc. No. 185, at 5–6.)

Despite the fact that the Proposed Settlement allocated more than fifty percent of the Relators' Share to Chancellor, Chancellor refused to sign that version of the Settlement Agreement, objected to the settlement overall, and insisted that a fairness hearing be held, at which her objections could be heard. The court conducted a full fairness hearing on April 13, 2021 at which all of Chancellor's objections to the settlement were overruled. At the conclusion of the hearing, the court gave Chancellor three options: (1) she could sign the Proposed Settlement with the Government's proposed allocation of the Relators' Share; (2) she could sign an amended version of the agreement that expressly left the allocation of the Relators' Share to the court's discretion; or (3) she could decline to execute any agreement altogether, in which event the other parties would be free to effectuate the settlement and allocate the proceeds among themselves. Chancellor indicated at the hearing that she needed time to decide.

Three days later, the parties notified the court that all parties had signed the final version of the Settlement Agreement in which the Government agreed to set aside, from the total settlement

amount, a Relators' Share of $610,684.62, to be divided among the relators in all four of the consolidated cases. (*Id.* ¶ 3.) The final Settlement Agreement, rather than making a specific allocation, states only that, if the parties cannot "agree as to the distribution of the Relators' share of the CPS Settlement Amount, the Court will make such a determination" but that Butner and Brown shall receive $21,351.83 from the Kroll Settlement Amount "upon written instructions from their counsel." (Settlement Agreement ¶ 3 n.2.) In addition, the court is to decide upon the distribution of the $138,000 earmarked for "attorney's fees and costs . . . as well as non-intervened claims and retaliation claims," unless the relators reach an agreement. (Settlement Agreement ¶ 4.)

In the two months following execution of the Settlement Agreement, the parties have apparently been unable to reach an agreement as to the allocation of either the Relators' Share or the $138,000. On June 16, 2021, the Moving Relators filed their present Motion to Allocate, and, on July 17, 2021, Chancellor filed her Motion to Be Deemed First-to-File.

## II.    LEGAL STANDARDS

The False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, authorizes private individuals, known as relators, to "bring a civil action . . . in the name of the Government" against those who make fraudulent claims against the United States, *id.* § 3730(b)(1). When a relator brings such a *qui tam* suit, the government may intervene and proceed with the action, or it may decline to intervene and allow the relator to proceed. *See id.* § 3730(b)(1)–(4), (c). The FCA encourages relators to bring *qui tam* suits by allowing them to share in any recovery obtained for the government. To avoid diluting this potential payout, the FCA's so-called "first-to-file rule" prohibits relators other than the first to file from "bring[ing] a related action based on the facts underlying the pending action." *Id.* § 3730(b)(5).

Subsection 3730(d), entitled "Award to *qui tam* plaintiff," provides in relevant part:

> If the Government proceeds with an action brought by a person under subsection (b), such person shall, subject to the second sentence of this paragraph, receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action.

*Id.* § 3730(d)(1). "[A] relator seeking recovery must establish that 'there exists [an] overlap between Relator's allegations and the conduct discussed in the settlement agreement.'" *Rille v. PricewaterhouseCoopers LLP*, 803 F.3d 368, 373 (8th Cir. 2015) (en banc) (quoting *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 651 (6th Cir. 2003)).

Thus, to be entitled to the relator's share under paragraph 3730(d)(1), a relator must be a person who "br[ings]" "an action under . . . subsection [3730(b)]." 31 U.S.C. § 3730(d)(1); *Rille*, 803 F.3d at 372 ("The relators' right to recovery is limited to a share of the settlement of the claim that they brought."). The first-to-file rule bars any "person other than the Government" from "bring[ing] a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5). "So only the first-to-file relator can claim the relator's share of the settlement proceeds for each claim." *United States v. Millenium Labs., Inc.*, 923 F.3d 240, 252 (1st Cir. 2019), *cert. denied sub nom. Est. of Cunningham v. McGuire*, 140 S. Ct. 851 (2020); *accord U.S. ex rel. Shea v. Cellco P'ship*, 863 F.3d 923, 927 (D.C. Cir. 2017) ("The first-to-file bar thereby ensures only one relator will share in the government's recovery . . . ."); *U.S. ex rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc.*, 149 F.3d 227, 231 (3d Cir. 1998) ("[N]o *qui tam* plaintiff may . . . share in a government settlement if his or her allegations repeat claims in a previously filed action.").

Alternatively, however, it also appears that, where more than one relator has pursued claims in which the government intervenes and that are ultimately settled, the relators may agree among themselves as to the allocation of the relator's share, as a matter of contract. *See, e.g.*, *United States v. Cmty. Health Sys., Inc.*, 666 F. App'x 410, 412 (6th Cir. 2016) (recognizing that

the relators' share was "split among all the individual relators in the various cases according to the sharing agreement that relators had reached before the settlement [with the defendant] was finalized"). As relevant here, the parties have left the allocation of the Relators' Share, as a matter of contract, to the court's basically unfettered discretion. (*See* Settlement Agreement ¶ 3 n.2.)

Otherwise, the conclusion that a relator may only share in the settlement of the claims he or she brought first "aligns with the policies underlying the first-to-file rule" embodied in the *qui tam* provision, which "attempts to reconcile two conflicting goals, specifically, preventing opportunistic suits, on the one hand, while encouraging citizens to act as whistleblowers, on the other." *Millenium Labs.*, 923 F.3d at 252 (internal quotation marks and citations omitted).

## III.  DISCUSSION

### A.  The Parties' Positions

In their motion and supporting memorandum, the Moving Relators represent that there is a legitimate basis in the record for declining to apportion any part of the Relators' Share to Chancellor. In particular, they claim that, because Alt was the first to file, and the total damages attributable to the claims she brought to the Government's attention exceed the value of the entire settlement amount, Alt would arguably be entitled to the entirety of the Relators' Share. In the spirit of compromise and in recognition of the fact that the Government did intervene in Chancellor's case and that Chancellor ultimately settled and released the claims that she brought, the Moving Relators have agreed among themselves—and propose that the court issue an order consistent with their agreement—that the Relators' Share be allocated as follows:

| RELATOR | PROPOSED SHARE ALLOCATION FROM CPS SETTLEMENT RELATOR SHARE |
|---|---|
| Alt | $385,336.30 |
| Pressotto | $64,977.20 |
| Butner & Brown | $60,531.05 (plus $21,351.83 from Kroll Settlement Amount) |
| Chancellor | $78,488.22 |

(Doc. No. 185, at 12.) The Moving Relators further propose to divide the $138,000 equally among their three cases ($46,000 each).

The Moving Relators acknowledge that the Government originally proposed that Chancellor receive an allocation of $313,952.89, based on its *pro rata* estimate of the damages reasonably traceable to Chancellor's allegations relating to fraudulent charges for genetic testing and iPad psychiatric screening. While they were willing to accept that recommendation in 2021, the Moving Relators argue now that, because Chancellor rejected the Government's proposed allocation, her allocation should, instead, be determined "based on her actual participation and contribution to this case," gauged in light of the same factors that typically guide courts' determination of the percentage of the total settlement that should be allocated to the relator under 31 U.S.C. § 3730(d)(1). (*See* Doc. No. 185, at 9.) More specifically, they argue that:

(1) Chancellor filed the last of the four consolidated cases, more than seven months after Alt filed the first *qui tam* complaint. Because the total settlement was based on the defendant's ability to pay rather than the total value of the Government's estimated damages, and the vast majority of the settlement funds came from a CMS suspension account, Chancellor's additional claims and allegations did not meaningfully alter the end result—meaning, in other words, that the Government likely would have received the same amount in settlement, even if Chancellor had

never filed her *qui tam* complaint. (Doc. No. 185, at 14.) The Moving Relators argue that these factors weigh strongly in favor of a significant reduction of Chancellor's allocation, as does the fact that the Government had already been made aware of the fraud from three other *qui tam* cases.

(2) Although Alt's *qui tam* complaint did not bring claims based on the fraud relating to genetic testing and iPad screening, Alt had informed the Government about those schemes in her disclosure interview in April 2016, six months before Chancellor filed her complaint, thus substantially limiting Chancellor's value to the Government as a whistleblower—a factor also warranting a reduction of her share. (Doc. No. 185, at 15.)

(3) Chancellor's involvement in the case has significantly hampered the other parties' efforts to resolve the case and has cost the Government, the court, and the other parties substantial time and effort without returning any additional funds to the Government. (Doc. No. 185, at 15 (citing DOJ Guidelines downward departure factor 8 ("The relator . . . did not provide any help after filing the complaint, hampered the Government's efforts in developing the case, or *unreasonably opposed the Government's position in litigation*." (emphasis added)).)

Based on the application of those factors, the Moving Relators propose a seventy-five percent reduction from the amount the Government originally proposed to allocate to Chancellor. Chancellor objects to the Moving Relators' proposed allocation without actually proposing an alternative. However, in her separately filed Motion to Be Deemed First-to-File, she argues that any relator's right to recovery is limited to a share of the settlement of the claims that the relator actually filed first and that she should be deemed the first to file claims related to both SVT and UDS, in addition to being deemed the first to file the iPad screening and genetic testing claims. Regarding her claim to be the first to file UDS-related claims, Chancellor argues that the Alt and Butner/Brown *qui tam* Complaints were not sufficiently specific to satisfy Rule 9(b) of the Federal

Rules of Civil Procedure. Regarding SVT, she asserts that a comparison of their respective pleadings reveals that she, not they, actually was the first to alert the government to CPS's fraud in conducting such tests.

Chancellor also provides a lengthy narrative history of the development in the case, generally contesting the Moving Relators' position that she only minimally contributed to the development and settlement of the claims against CPS. She contends, instead, that she relayed to the Government more information and evidence than the other relators and provided substantial assistance to the Government. She denies delaying the settlement process and insists that she had been requesting a fairness hearing since September 2020 and that, instead of respecting her decision in that regard, the other parties attempted to force a settlement on her. She also maintains that the written proposed settlement agreement was not circulated until November 2020, that this version had many errors that all of the other parties had overlooked, and that she insisted be corrected, but they were not ultimately corrected until February 2021. Additionally, she argues that the Moving Relators are unfairly using her decision to allow the court to allocate the Relators' Share among the relators as an opportunity to "punish" her for making that decision. (Doc. No. 193, at 13.) She asserts that the Moving Relators offer no legal support for the proposition that a relator's right to a share of the settlement can be "abrogated by an agreement to which the relator was not a party." (*Id.* at 15.)

In their Reply, the Moving Relators contend that it is far too late, post-intervention and post-settlement, to claim that the other relators' complaints are legally infirm under the pleading standard established by Rule 9(b). Otherwise, the Moving Relators do not engage with Chancellor's arguments, asserting instead that she has not "meaningfully refute[d] any of the arguments" made in their Motion to Allocate. (Doc. No. 194, at 1.)

### B.    The Moving Relators' Motion to Allocate

As a general proposition, the court is not persuaded that Chancellor should effectively be punished for challenging the Government's proposed allocation of the Relators' Share or that her share should be calculated based on the factors intended to guide a determination of what percentage of the total settlement should be allocated to the relator (or relators) in the first place. The court reaches that conclusion based, first, on the fact that the Government did not express an intention that Chancellor's portion of the Relators' Share be reduced based on lack of substantial assistance or interference in the settlement process. And second, as indicated by the legal standards articulated above, a relator's "right to recovery is limited to a share of the settlement of the claim that [she] brought." *Rille*, 803 F.3d at 372. As a result, an allocation of a disproportionate amount of the settlement to the Moving Relators is not supported either by the law or the facts. Thus, for the same reason, the court rejects the Moving Relators' argument that relator Alt would be entitled to claim the entirety of the Relators' share. The Government and CPS could have structured the settlement to make it clear that all of the settlement proceeds were traceable to the UDS claim, but, instead, the Settlement Agreement specifically provides for the settlement and dismissal with prejudice of all claims asserted against CPS.

The court, in sum, rejects the Moving Relators' proposal that the Government's proposed allocation of the Relators' Share to Chancellor be reduced by seventy-five percent and declines to adopt the Moving Relators' agreement in that regard.

### C.    Chancellor's Motion to Be Deemed First to File

#### 1.    Rule 9(b) and the UDS Claim

The Moving Relators contend that it is far too late for Chancellor to contest the validity of their *qui tam* complaints under Rule 9(b). The court agrees. In *Roberts v. Accenture, LLP*, 707 F.3d 1101 (8th Cir. 2013), the government argued, in the context of a dispute as to the appropriate

percentage of an FCA settlement that should be awarded to the relators, that "a *qui tam* claim which is deficient as measured by Rule 9(b) standards necessarily lacks the type of specific information about fraud that would provide the government any meaningful assistance." *Id.* at 1017 (internal quotation marks omitted). It urged the court to "incorporate the requirements for surviving a motion to dismiss under Rule 9(b) into the test for determining whether 'the Government proceeds with an action brought by [a relator]' for purposes of an award to a *qui tam* plaintiff under 31 U.S.C. § 3730(d)." *Id.*

The Eighth Circuit declined that invitation, holding that Rule 9(b) plays no part in the determination of whether a relator is entitled to share in the settlement proceeds from a claim in which the government elected to intervene. *Id.* As the court observed,

> Rule 9(b)'s standards are meant to test the sufficiency of a complaint at its outset. If a defendant challenges the sufficiency of a complaint's allegations at the outset of a case, a plaintiff still has the opportunity to cure the deficiency. In contrast, section 3730(d) only comes into play at the conclusion of a case, after the action has already proceeded to a judgment or a settlement. If the government is allowed to contend at the conclusion of a case that a relator's initial allegations were insufficient, even though the government implicitly acknowledged the legal sufficiency of the pleadings by choosing to intervene, the relator no longer has the opportunity to cure the deficiency.

*Id.* at 1017–18; *accord United States v. Shire Regenerative Med., Inc.*, No. 8:11-CV-176-T-30MAP, 2017 WL 6816615, at *5 (M.D. Fla. Nov. 20, 2017) (finding that "a challenge to a *qui tam* complaint based on a failure to plead the claim with particularity under Rule 9(b) is conducted by a party at the motion to dismiss stage" and, therefore, that "any argument on the part of the other Relators that [one set of relators is] entitled to none of the settlement proceeds because [their] Complaint was not sufficiently pled with particularity fails").

This court agrees, finding that it is far too late in these proceedings to challenge the validity of any relator's complaint on Rule 9(b) grounds. It is also unclear, as the Middle District of Florida noted, whether one relator would even have standing to raise a Rule 9(b) challenge to another

relator's pleading. *Shire Regenerative*, 2017 WL 6816615, at \*5. *But see U.S. ex rel. Dhillon v. Endo Pharms.*, 617 F. App'x 208, 213–14 (3d Cir. 2015) (affirming the district court's rejection on the merits of a Rule 9(b) claim raised in the context of a dispute between relators over the allocation of the relator's share based on the first-to-file rule).

The court, therefore, will deny Chancellor's motion, insofar as she seeks to be deemed the first to file UDS claims based on the purported deficiency of the other relators' UDS claims.

2. *SVT Claim*

Chancellor also argues that the Government simply erred in lumping together the UDS and SVT claims and that she should be deemed the first to file a claim related to medically unnecessary SVT.

Resolution of a first-to-file dispute requires a comparison of the complaints at issue. *See U.S. ex rel. Heath v. AT & T, Inc.*, 791 F.3d 112, 121 (D.C. Cir. 2015) ("Similarity is assessed by comparing the complaints side-by-side, and asking whether the later complaint alleges a fraudulent scheme the government already would be equipped to investigate based on [the first] [c]omplaint." (internal quotation marks and citation omitted)); *In re Nat. Gas Royalties Qui Tam Litig.* (CO2 Appeals), 566 F.3d 956, 964 (10th Cir. 2009) ("The first-to-file bar is designed to be quickly and easily determinable, simply requiring a side-by-side comparison of the complaints.").

The court has reviewed and compared the relator complaints filed in this case. Chancellor's Complaint (Case No. 3:19-cv-102, Doc. No. 1) is undoubtedly more detailed than the earlier-filed complaints filed by Alt (Case No. 3:16-cv-549, Doc. No. 1) and Butner and Brown (Case No. 3:16-cv-561, Doc. No. 1) regarding the defendants' UDS scheme. However, while Alt, Butner and Brown do not expressly reference or describe Specimen Validity Testing, neither does Chancellor. The Government has described SVT as a part of the UDS fraud scheme. (*See* Gov't Complaint in Intervention, Case No. 3:16-cv-549, Doc. No. 65 ¶ 129 ("CPS had weekly conference calls with

providers to ensure that they were ordering and billing for the full panel of UDS, which included specimen validity testing.").) The Government apparently concluded that Alt's (nationwide) and Butner and Brown's (Tennessee-related) allegations of fraudulent and unnecessary UDS tests were sufficient to encompass—and to put it on the track of investigating and uncovering—the medically unnecessary SVT as well. *Accord Heath*, 791 F.3d at 122 (observing that a second claim will be barred by the first-to-file rule where the first has "already put the government on notice of both the nature and reach of the alleged fraud" and that "the greater fraud often includes the lesser"). The court finds, in short, no legitimate basis in the record for deeming Chancellor the first to file SVT-related claim.

Chancellor's Motion to Be Deemed First to File will, accordingly, be denied.

**D.      Allocation of the Relators' Share**

The court finds that neither Chancellor nor the Moving Relators have provided a basis for deviating from the Government's proposed allocation as set forth in the Proposed Settlement that Chancellor declined to accept. That proposed distribution was based on the first-to-file attributions and the Government's estimation of the *pro rata* value of each of the settled claims in proportion to the total CPS Settlement Amount, as illustrated in the charts on pages 4–5, *supra*. The United States will be directed, in accordance with Paragraph 3 of the Settlement Agreement, to submit payment to the Relators as follows:

1.      $212,832.59 to Alt;

2.      $30,595.57 to Butner and Brown;

3.      $31,951.74 to Pressotto; and

4.      $313,952.89 to Chancellor

This distribution does not include the share from the Kroll Settlement Amount which, the court presumes, has already been distributed to Butner and Brown.

### E.      Distribution of the Remaining $138,000

The FCA provides that any relator entitled to an award under the terms of 31 U.S.C. § 3730(d) "shall also receive an amount for reasonable expenses . . . plus reasonable attorneys' fees and costs." Each of the relators has been deemed the first to file at least one intervened and settled claim and, as such, is entitled to some portion of the Relators' Share. Under the statute, they are each also entitled to a reasonable attorney's fee. There is no question that the amount allocated by the Settlement Agreement to cover the relators' attorneys' fees is far less than the actual value of the services provided by the various attorneys, but additional funds were simply not available from CPS.

The Moving Relators, as indicated above, request that the $138,000 be allocated to attorneys' fees and divided equally among their three cases. Chancellor argues that this amount was not earmarked solely for attorneys' fees but "also reserved for non-intervened and retaliation claims." She contends that, because she and Pressotto were the only relators who filed amended pleadings against CPS after the Government intervened, thereby preserving their retaliation claims, she and Pressotto should receive more of this amount than Alt and Butner and Brown. She also claims it would be unfair to "allow attorney fees to supersede Relator's retaliation claims, especially in a case where the defendant 'doesn't have any money.'" (Doc. No. 193, at 25.)

Chancellor is correct that, pursuant to the Settlement Agreement, CPS agreed to pay $138,000 directly to the relators "for attorneys' fees and costs incurred by Relators, as well as non-intervened claims and retaliation claims." (Settlement Agreement ¶ 4.) However, the relators have also left to the court's discretion the distribution of this sum. There is no evidence in the record regarding the value of the non-intervened claims, and, irrespective of any potential value they might have had, all of the parties, including Chancellor, agreed to release their non-intervened claims. In addition, it is irrefutable that none of the attorneys in any of these *qui tam* cases will be

fully compensated for their time and expenses, due to the limited pool of funds available. Consequently, in terms of overall fairness, the court finds that the entirety of this remaining sum should go toward the relators' attorneys' fees. Because Chancellor is no longer represented by counsel, the court accepts the Moving Relators' proposal that this sum be divided equally among their three cases, with counsel for Alt, Butner and Brown (together), and Pressotto each receiving $46,000. Counsel for CPS, who are currently holding this sum in escrow, will be directed to distribute the funds in accordance with this Memorandum.

## IV.      CONCLUSION

As set forth herein, the Moving Relators' Motion to Allocate will be granted in part and denied in part, and Chancellor's Motion to Be Deemed First to File will be denied. The Government and CPS will be directed to distribute the Relators' Share and additional $138,000 as set forth herein.

An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge